# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff,

v.                                                            Case No. 15-20631

GARY MICHAEL FEITEN

      Defendant.

                                /

## ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS

Defendant Gary Michael Feiten was indicted on one count of Transportation of Child Pornography under 18 U.S.C. § 2252A(a)(1), one count of Receipt of Child Pornography under 18 U.S.C. § 2252A(a)(2), and one count of Possession of Child Pornography under 18 U.S.C. § 2252A(a)(5)(B). Before the court is Defendant's Motion to Suppress Evidence, in which Defendant challenges as violations of the Fourth Amendment the initial search and seizure of his laptop computer at the Detroit Metropolitan Airport on February 15, 2015 and its subsequent forensic analysis at the Homeland Security Investigation office nearby. (Dkt. # 26.) The court held a hearing on the matter on February 2, 2016. For the reasons stated below and on the record, the court will deny Defendant's Motion to Suppress.

## I. BACKGROUND AND FACTS

On February 15, 2015, Defendant left Cancun, Mexico on an international flight bound for the Detroit Metropolitan Airport. (Dkt. # 27, Pg. ID 119.) Upon landing at Detroit, but before Defendant or his property had "cleared" customs and entered the United States, Customs Officers noticed Defendant "act[ed] nervously and avoid[ed] eye contact" during his initial inspection. (*Id.*) This behavior, combined with other facts including that he was traveling from an area known for the production of contraband and

as a destination for child sex tourism, prompted the officials to refer Defendant to the secondary inspection area for further inquiries.  (*Id.*)

Once at the secondary area, Defendant's tic continued: "[h]e appeared nervous; he 'dry-washed' his hands several times and continued to avoid eye contact." (*Id.*)  He told the officers that he traveled to Mexico 4-5 times a year; this trip, he said, was for SCUBA diving.  (*Id.*)  He carried with him on this supposed underwater expedition a laptop computer, a camera, and a tripod. (Dkt. # 27, Pg. ID 119.) In truth, the Defendant was known to have left the United States at least eighteen times during the previous two years, and having been referred to secondary inspection—although resulting in nothing noteworthy—on three previous occasions in that time.  (Dkt. # 26-1, Pg. ID 77.)

Around 8:45 p.m., less than an hour after Defendant's plane landed, Officer Matthew Miller requested and received permission from Defendant to search his laptop, camera, and cell phone.  (Dkt. # 27, Pg. ID 119.)   While the latter two devices yielded nothing suspicious, Officer Miller discovered on Defendant's computer one image, or possibly two, that he suspected to be "child erotica."  Upon seeing this, Officer Miller discontinued his search and contacted Special Agent Jay Raterman, a specialist on child pornography with the United States Customs and Border Protection (CBP).

Special Agent Raterman arrived at the airport at approximately 11:00 p.m., confirmed that the discovered images were "child erotica," and attempted to conduct a more extensive search of the laptop using a program called OS Triage.  (Dkt. # 27, Pg. ID 120.)  "OS Triage is a software tool that [generates] a 'thumbnail' preview of pictures and videos on a computer and can identify which of those . . . have file names that match known file names of child pornography." (*Id.*)  The software stalled twice.  (*Id.*)  Special Agent Raterman, therefore, detained the laptop at the border but allowed Defendant himself to clear customs around 12:15 a.m. (*Id.*)

On the next business day, Special Agent Raterman again searched the laptop for child pornography using the OS Triage program, this time in the Homeland Security Investigations office located in Romulus, Michigan several miles from the airport. (*Id.* at Pg. ID 121.)  The preview search took just under two hours, and produced 178 known images of child pornography. (*Id.*)  Based on this discovery, Special Agent Raterman turned the laptop over to Joshua Edwards, a Certified Forensic Analyst, for a full forensic examination.  (*Id.*)  Edwards made a "forensic image of Mr. Feiten's computer, copying his entire hard drive." (Dkt. # 26-1, Pg. ID 78.)   Over the next month, Edwards performed a series of tests, revealing 446 images of child pornography in addition to the original 178 images generated by OS Triage—a total of 624 contraband images. (*Id.* at 78.)  At no time before any of these previews, scans, or inspections had the computer actually "entered" the United States, having been held at the border (or its functional equivalent). These 600-some images form the basis for the indictment at hand.

## II. STANDARD

The Fourth Amendment guarantees that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."  U.S. Const. Amend. IV.  Nevertheless, the "Supreme Court has recognized a broad exception to the Fourth Amendment's requirement of probable cause or a warrant for searches conducted at the border because '[t]he Government's interest in preventing the entry of unwanted persons and effects is at its zenith at the international border."  *United States v. Stewart,* 729 F.3d 517, 524 (6th Cir. 2013) (quoting *United States v. Flores-Montano,* 541 U.S. 149, 152 (2004).  "The Court has characterized such searches as *per se* reasonable[.]" *United States v. Laich*, No. 08-20089, 2010 WL 259041, at *3 (E.D. Mich. Jan. 20, 2010)

3

(Cook, J.) (citing *United States v. Ramsey,* 431 U.S. 606, 616 (1977)).  However, the "dignity and privacy interests of the person being searched" occasionally demands "some level of suspicion in the case of highly intrusive searches."  *Flores-Montano,* 549 U.S. at 152.

The Sixth Circuit has held that a "routine border search of a laptop computer" does not require any level of suspicion, even when the computer "is transported . . . beyond the border." *Stewart,* 729 F.3d at 525. After all, "property [which] remains in the custody of CBP . . . may be tested off-site by private testing or by CBP until 'cleared' for entry."  *Id.  See also, Almeida-Sanchez v. United States,* 413 U.S. 266, 272-73, 93 S. Ct. 2535, 2539, 37 L. Ed. 2d 596 (1973) ("[S]earches of this kind may in certain circumstances take place not only at the border itself, but at its functional equivalents as well.")

### III. DISCUSSION

Defendant's briefed arguments are fluid, but seem to challenge the constitutionality of the search and seizure of the laptop on four distinct legal theories. First, he argues that "The Length of Mr. Feiten's Border Stop is Offensive" and therefore "Violates the Fourth Amendment." (Dkt. # 26-1, Pg. ID 81.)  Second, he urges the court to expand the Supreme Court's holding in *Riley v. California,* 134 S.Ct. 2473 (2014), and find all warrantless searches of electronic devices at the border unconstitutional. (*Id.* at Pg. ID 85-90.)  Third, he claims that the officers' seizure of his laptop was illegal because it lacked probable cause.  (*Id.* at 90-92.)  Finally, he argues that the "Extended Border Search" Doctrine "Required the Agents to Obtain a Search Warrant."  (*Id.* at 92.) Each argument will be addressed and rejected in turn.

### A. Length of Search

While Defendant acknowledges that the "stop, search, and interrogation" in the airport constituted a "routine" border search, he nonetheless argues that the agents acted in violation of his Fourth Amendment rights because the search, which lasted just

4

over four hours, took too long. (*Id.* at 81.)  This is an unsupportable argument.  Having conceded that the search was "routine," Defendant must also concede that the search was lawful, since ""[t]he Court has characterized such searches as *per se* reasonable[.]" *Laich*, 2010 WL 259041, at *3. (citing *Ramsey,* 431 U.S. at 616).  Defendant has provided no case law which suggests that a search can be both routine and unreasonable.

To the extent Defendant is arguing that the four-hour delay transformed an otherwise lawful detention into a *non*-routine border search, his argument fails.  The Supreme Court has discouraged the use of "[c]omplex balancing tests" to delineate the difference between routine and non-routine searches. To the extent that non-routine searches have been discussed, the Court has generally suggested that they may include "highly intrusive searches of the person" that infringe on the "dignity and privacy interests of the person being searched,"  *Flores-Montano,* 541 U.S. at 152, such as "strip, body cavity, [and] involuntary x-ray searches," *United States v. Montoya de Hernandez,* 473 U.S. 531, 541 n. 4 (1985).  Searches of property which are "destructive" have similarly been categorized by the Court as non-routine.  *Flores-Montano,* 541 U.S. at 155-56.  By contrast, "[x]-ray examinations of luggage," *United States v. Lawson*, 461 F.3d 697, 701-02 (6th Cir. 2006), simple "pat-down[s]," *Dodd v. Doe*, 118 F. Supp. 2d 777, 780 (E.D. Mich. 2000) (Cook, J.), and non-forensic searches of electronics that have not yet cleared customs, *Stewart,* 729 F.3d at 525, have been designated routine border searches.  As the First Circuit has noted, the distinction between routine and non-routine border searches depends upon "[t]he degree of invasiveness or intrusiveness associated with any particular type of search." *United States v. Braks*, 842 F.2d 509, 511-12 (1st Cir. 1988).

Defendant relies on *United States v. Place,* 462 U.S. 696 (1983), to argue that "the four-hour extensive search and seizure of Mr. Feiten and his computer went

*beyond* the brief border search that is considered per se reasonable." (Dkt. # 26-1, Pg. ID 84 (emphasis added)).  In *Place,* the Court held that a "90-minute detention of respondent's luggage," during which DEA agents transferred the bags from one New York airport to another in order to facilitate a canine sniff test, was alone "sufficient to render the seizure unreasonable." 462 U.S. at 710.  Defendant focuses on the time required for the search, and argues that because he was subjected to a search which lasted more than twice as long as the one in *Place*, his search should be deemed similarly unconstitutional. (*See* Dkt. # 26-1, Pg. ID 84.)  But, *Place* involved a *domestic* search and seizure, not one conducted at the border.  Not all searches conducted in airports constitute border searches. *See United States v. Brennan,* 538 F.2d 711 (5th Cir. 1976) (holding that the search of a recently arrived airplane was not considered a border search when it did not arrive from an international location).  Place was flying into LaGuardia from Miami. He never left and therefore was not re-entering the country. Place's Fourth Amendment interests had not been diminished by international travel before the "delay-and-sniff" search.  *Place* and its progeny are of no value in assessing the instant search.

Defendant's reliance on *United States v. Laich,* No. 08-20089, 2010 WL 259041 (E.D. Mich. Jan. 20, 2010) (Cook, J.), is similarly ill-founded.  In *Laich,* another judge of this district found that an entrant's Fourth Amendment rights were violated when he and his laptop were detained for 90 minutes by border officials. *Id.* at *5. But there, the entrant had been allowed to clear customs and enter the United States *before the detention. Id.* at *2.  The subsequent detention and forensic inspection of his laptop was therefore not a border search, and thus not governed by the border search doctrine.

As a consequence, Defendant has pointed to no authority, either binding or instructive, which suggests that a four-hour duration transforms an otherwise

6

reasonable border search into a non-routine border search.  On the contrary, the
Supreme Court has noted that "no case[] indicate[s] [that] the Fourth Amendment
shields entrants from inconvenience or delay at the international border." *Flores-*
*Montano,* 541 U.S. at 155 n. 3.  As such, it has "consistently rejected hard-and-fast time
limits," finding instead that "common sense and ordinary human experience must
govern over rigid criteria." *Montoya de Hernandez,* 473 U.S. at 543 (quoting *United*
*States v. Sharpe,* 470 U.S. 675, 685 (1985)). Applying this standard, the Second Circuit
has found that "the duration of . . . border stops" on its own "does not render them
impermissibly intrusive."  *Muhammad v. Ahern,* 350 F. App'x 529, 531 (2d Cir. 2007).
For example, "common sense and ordinary human experience suggest that it may take
up to six hours for CBP to complete the various steps" of a routine border inspection,
which may include "vehicle searches, questioning, and identification verification."
*Tabbaa v. Chertoff*, 509 F.3d 89, 100 (2d Cir. 2007) (internal quotations omitted) .  "The
additional . . . hours, while certainly inconvenient, thus *cannot* be considered an
unexpected level of intrusion into a person's privacy."  *Id.* (internal quotations omitted)
(emphasis added).

By the same token, the duration of the search and seizure of Defendant's
electronics at the airport cannot be considered unreasonably intrusive.  Defendant
cleared customs just four hours after his plane from Mexico landed.  "Common sense
and ordinary human experience" therefore suggests that the so-called "four-hour
extensive search and seizure" almost certainly included time to depart the aircraft, and
to stand in line.  It is not unreasonable to suggest that this kind of ordinary delay, in
addition to the time necessary to interview the entrant at the border, refer him to the
secondary area, and perform a forensic preview search of three different electronic
devices, could require four hours or more to conduct.  None of these actions,

individually or collectively, constitute an unreasonable invasion of privacy interests, and thus do not transform the officers' actions into a non-routine border search.

However, even if a four-hour delay at customs did somehow automatically render a routine inspection a non-routine border search, the officers' actions were still justified. Even during a non-routine border search, an international traveler's Fourth Amendment protections are diminished, and customs officials need only reasonable suspicion to proceed. *See Montoya de Hernandez,* 473 U.S. at 540. "Under this standard officials at the border must have a 'particularized and objective basis for suspecting the particular person'" of transporting contraband into the country. *Id.* at 541 (quoting *United States v. Cortez,* 449 U.S. 411, 417 (1981)).

Here, customs officials observed Defendant "acting nervously and avoiding eye contact" upon approaching the United States border from a country known for "narcotics, child pornography and child sex tourism." (Dkt. # 27, Pg. ID 119.)  During his secondary inspection, he was seen "dry-wash[ing] his hands several times and continu[ing] to avoid eye contact." (*Id.*)  He was carrying studio-type photographic equipment on a diving trip. (*Id.*)  During a preliminary preview of his laptop computer, officers discovered at least one image recognized to be child erotica, which at the suppression hearing Special Agent Raterman testified is usually discovered in tandem with child pornography.[1]  Taken collectively, the officers certainly had a "particularlized and objective basis for suspecting" that Defendant may have been attempting to transport child pornography into the United States, and were therefore justified to

_____

[1] Special Agent Raterman explained that the L.S. models style of child pornography usually consists of a series of images of prepubescent females dressed in a sexually provocative manner and wearing heavy make-up.  Over the course of the series, the children change positions and gradually lose clothing until they are completely nude.  Thus the first few images in each series would generally be considered "child erotica" while the final images would be "child pornography."

continue to detain him and his possessions while an expert attempted to run OS Triage on his computer.  The court rejects this aspect of Defendant's argument.

### B. *Riley v. California*

Defendant also argues that "[a] forensic computer search" at the border "is unlawful in light of *Riley v. California*." (Dkt. # 26-1, Pg. ID 85.) Defendant is not correct. In *Riley*, the Court declined to extend the search-incident-to-arrest exception "to searches of data on cell phones, and h[e]ld instead that officers must generally secure a warrant before conducting such a search." 134 S.Ct. at 2485.  Defendant insists that this holding stands for the proposition "that law enforcement should not be able to invade an individual's personal life (via phone or laptop) and gather any and all information about the individual without first getting a warrant." (Dkt. # 26-1, Pg. ID 87). After all, Defendant argues, "technology evolves," and the "unique quality and quantity of electronic data creates a significant expectation of privacy, thereby rendering exhaustive exploratory searches more intrusive than with other forms of property. (*Id.* at Pg. ID 86.)  While this may be true, *Riley* did not generate a blanket rule applicable to any data search of any electronic device in any context.  On the contrary, the Court simply held that "application of the search incident to arrest doctrine to [searches of digital data] would untether the rule from the justifications underlying" it historically.  *Id.*

The appropriate application of *Riley* to the instant case, therefore, is to determine whether allowing agents to forensically search an entrant's laptop at the border without first obtaining a warrant would necessarily untether *that* rule from the historical justifications underlying it. While the Supreme Court justified its allowance of warrantless searches made incident to arrest out of concern for officer safety and the preservation of evidence, *Chimel v. California,* 395 U.S. 752, 762-63 (1969), it "has recognized a broad exception to the Fourth Amendment's requirement of probable cause or a warrant for searches conducted at the border because '[t]he Government's

9

interest *in preventing the entry of unwanted persons and effects* is at its zenith at the international border." *Stewart,* 729 F.3d at 524 (quoting *Flores-Montano,* 541 U.S. at 152 (emphasis added)). In other words, warrantless border searches are justified "pursuant to the long-standing right of the sovereign to protect itself by stopping and examining persons and property crossing into this county." *Ramsey,* 431 U.S. at 616.

This justification actually *predates* the Fourth Amendment. The same Congress that proposed the Bill of Rights had, two months earlier, passed the nation's first customs law which "granted customs officials 'full power and authority' to enter and search 'any ship or vessel, in which they shall have reason to suspect any goods, wares or merchandise subject to duty shall be concealed.'" *United States v. Ramsey,* 431 U.S. 606, 616 (1977) (quoting Act of July 31, 1789, c. 5, 1 Stat. 29 § 24). Under this law, these port searches were legal even in the absence of a warrant or probable cause, in contradistinction to searches of "any particular dwelling-house, store, building, or other place" *within* the country which required both. *Id.* As such, the Court has repeatedly explained that, because "this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind [i.e. warrantless border searches] as 'unreasonable,' and they are not embraced within the prohibition of the amendment." *Boyd v. United States*, 116 U.S. 616, 623 (1886); *see also ,* 431 U.S. at 617. Stopping contraband—and, where appropriate, collecting revenue from dutiable goods—was that important.

The Court elaborated on this justification in 1925, observing that

It would be intolerable and unreasonable if a prohibition agent were authorized to stop every automobile on the chance of finding liquor and thus subject all persons lawfully using the highways to the inconvenience and indignity of such a search. Travelers may be so stopped in crossing an international boundary because of *national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in.*

10

*Carroll v. United States*, 267 U.S. 132, 153-54 (1925).  And again in *United States v.*

*Thirty-seven Photographs*, 402 U.S. 363, 376 (1971), the Court held:

> [A] port of entry is not a traveler's home.  His right to be let alone neither prevents
> the search of his luggage nor the seizure of unprotected, but illegal, materials
> when his possession of them is discovered during such a search.  Customs
> officials characteristically inspect luggage and their power to do so is not
> questioned in this case; it is an old practice and is intimately associated with
> excluding illegal articles from the country.

*See also United States v. 12 200-Ft. Reels of Film,* 413 U.S. 123, 125 (1973)

("Historically, such broad powers have been necessary to prevent smuggling and to

prevent prohibited articles from entry."); *Flores-Montano*, 541 U.S. at 152 ("[S]earches

made at the border, pursuant to the longstanding right of the sovereign to protect itself

by stopping and examining persons and property crossing into this country, are

reasonable simply by virtue of the fact that they occur at the border.").

Allowing customs officials without a warrant to forensically search an electronic

device presented at an international border or its equivalent is utterly consistent with its

historical mooring of protecting the country by preventing unwanted goods from

crossing the border into the country.  Laptops and cell phones are indeed becoming

quantitatively, and perhaps qualitatively, different from other items, but that simply

means there is more room to hide digital contraband, and therefore more storage space

that must be searched.  Merely because a large container is presented at the border,

the government's right to inspect its contents is not diminished as compared to its right

to inspect a comparatively small container.  If customs officials may search an entire

cargo container, which they may, *United States v. Boumelhem,* 339 F.3d 414 (6th Cir.

2003) (holding that search of a forty-foot long shipping container was a constitutional

border search), then they may search an entire computer. *See also United States v.*

*Seljan*, 547 F.3d 993, 1015 (9th Cir. 2008) (Kozinski, J. dissenting) ("[C]ontainers of any

size and kind can be opened at the border and inspected for contraband) (citing

*Ramsey*, 431 U.S. at 606))

11

Child pornography is illegal. Customs officials are authorized to prevent the importation of contraband images and videos across the international border.  To do so effectively, it is necessary to search entrants' electronic devices as "most child pornography crimes involve use of a computer."  *United States v. Roehl*, 561 F. App'x 531. 532 (7th Cir. 2014); *see also United States v. Lemon*, No. 08-246, 2008 WL 4999235 (D. Minn. Nov. 19, 2008) ("Individuals who seek sexual gratification involving children often store images of child pornography on their computers, often for months or years.").  While laptops and cell phones may be new and increasingly capacious "containers," searching the effects, digital or otherwise, of those who present themselves at the international border for inspection is an "old practice . . .  intimately associated with excluding illegal articles from the country."

Defendant concedes that the "initial brief search of Mr. Feiten's laptop was reasonable," (Dkt. # 26-1, Pg. ID 80), objecting instead only to the subsequent "forensic" search, (*Id.* at Pg. ID at 85).  Defendant does not explain exactly what he means by a "forensic" search, but seems to suggest that it includes anything more extensive than border agents "manually clicking through the desktop, media folders, and internet browser history."  (*Id.*)

To the extent that Defendant objects to Special Agent Raterman's use of the OS Triage software, his argument fails.  Having conceded that a manual search of his laptop would be permissible, he must also concede that the forensic preview using the OS Triage software was permissible. The OS Triage is actually *less* invasive of personal privacy than is a search done by hand.  A border agent inspecting a computer manually, "page-by-page" in an electronic format, would access any document or program stored on the device, but a forensic preview using OS Triage merely "allows a 'thumbnail' preview of *pictures and videos* on a computer and can identify which of those pictures and videos have file names that match known file names of child pornography."  (Dkt. #

27, Pg. ID 120 (emphasis added).)  Contrary to Defendant's assertions, "OS Triage cannot locate deleted files or files that may be stored in carved or unallocated space nor can it access files that have been password-protected or retrieve images viewed on non-pornography related websites."  (*Id.*). Furthermore, as Special Agent Raterman explained at the suppression hearing, OS Triage maintains the integrity of the files previewed, while a manual search can actually alter key evidentiary aspects of each file inspected, such as the date and time the file was last viewed.  The use of such software, therefore, amounts to an exercise of electronic restraint on the part of border agents, appropriately "tethered" to its interest of preventing the introduction of contraband into the United States.

Even when considering the more intrusive "complete forensic exam" performed between February 16 and March 16, 2016, (Dkt. #26, Pg. ID 73) the court can locate no justification for finding that the government acted inappropriately in not obtaining a warrant.  The laptop was still at the border or its equivalent, having not yet been legally admitted to the United States. In fact, att the suppression hearing, Special Agent Raterman testified that the laptop remains at the border today and has still not been admitted to the United States.  Customs officials were therefore empowered with plenary authority to search for contraband.

Even if the court were to find that making "a full digital copy [of] the computer's hard drive" (Dkt. # 26, Pg. ID 73) and testing it was considered a highly intrusive search that infringed on Defendant's "dignity and privacy interests," *Flores-Montano,* 541 U.S. at 152—although the court is not at all convinced that it was—Defendant has failed to point to any authority suggesting that such a conclusion would necessitate a warrant. To the contrary, the Supreme Court and Sixth Circuit have both indicated that even the highly intrusive searches that are carried out in a "particularly offensive manner" such as "strip searches or body cavity searches" require only that the border agents to have reasonable suspicion. "Suspicion," based upon facts assessed with reason and

13

common sense, was certainly present here. By the time Edwards began his "complete forensic analysis," border agents had already discovered 178 images of child pornography, not mere "erotica," on Defendant's laptop.  The agents had at least 178 valid reasons to suspect that more contraband might be contained therein.

Thus, while the court agrees that "there is no need to broaden the border exception," (Dkt. # 26-1, Pg. ID 85), there is also no reason to narrow it.  The court rejects this aspect of Defendant's Motion.

## C. Probable Cause

Defendant once again cites *Place, Riley*, and *Laich*, this time to argue that "the general rule [is] that seizures should not be allowed without probable cause or prior approval of a judge or magistrate."  (Dkt. # 26-1, Pg. ID 91.)  As such, he claims that the government's "permanent seizure" of his electronic devices was unconstitutional because the government lacked probable cause. This is incorrect.  As noted above, none of these cases deal with searches and seizures *at the border*, and therefore are not helpful to the case at hand.  The actual rule is that "Congress has granted the Executive plenary authority to conduct routine searches *and seizures* at the border, without probable cause or a warrant, in order to regulate the collection of duties and to prevent the introduction of contraband into this country."  *Montoya de Hernandez,* 473 U.S. at 537 (emphasis added).  Having already concluded that the border search and seizure in question were routine, the court concludes that no additional probable cause element was necessary, and rejects this aspect of Defendant's motion as well.

## D. Extended Border Search

Finally, Defendant argues that the initial preview and later forensic search of his laptop at the Homeland Security Investigation's office in Romulus, Michigan constituted an "extended border search," and therefore required reasonable suspicion to be lawful. This argument mischaracterizes the law.  The Sixth Circuit has adopted the "extended border search doctrine."  *United States v. McGinnis*, 247 F. App'x. 589, 593 (6th Cir.

14

2007).  "Distinct from border searches, extended border searches 'occur *after the actual entry has been effected* and intrude more on an individual's normal expectation of privacy.  Therefore, extended border searches must be justified by 'reasonable suspicion' that the subject of the search was involved in criminal activity . . . ."  *Stewart,* 729 F.3d at 525 (quoting *United States v. Alfonso,* 759 F.2d 728, 734 (9th Cir. 1985) (emphasis added)).  The *McGinnis* court articulated a three-prong test to decide whether to uphold a warrantless extended border search, asking:

> (1) did the individual cross the border?
>
> (2) did law enforcement seize the individual and her luggage sufficiently soon after the crossing to be reasonably confident that the condition of the individual and her luggage did not change after the border crossing? And
>
> (3) does law enforcement have a reasonable suspicion that the individual violated a criminal law?

*McGinnis,* 247 F. App'x at 594.

But the Sixth Circuit has also stated that a "routine border search of a laptop computer is not transformed into an 'extended border search' simply because it is transported twenty miles beyond the border and examined within twenty-four hours of the initial seizure."  *Stewart,* 729 F.3d at 525.  In fact, Congress has passed legislation stating that "[i]n the course of conducting a customs examination, property remains in the custody of CBP and may be tested off-site by private testing or by CBP until 'cleared' for entry."  *Id.* (citing 19 U.S.C. § 1499(a)(1), (a)(2)(B), (b)(1-3), and (c)(1)).

Defendant's argument fails because the two disputed searches, i.e., Special Agent Raterman's two-hour preview search using OS Triage and Joshua Edwards's later forensic tests, both took place before Defendant's property crossed the border and entered the United States: the laptop was transported by agents into the United States in a physical sense but remained at the border in a constructive sense.  *Ramsey,* 431 U.S. at 609 (General Post Office building in mid-New York City constituted the "border"

15

for purposes of inspection of mailed envelope). Accordingly, the "extended border search" doctrine is inapplicable; reasonable suspicion is not required.

## IV. CONCLUSION

For the reasons stated above and on the record, IT IS ORDERED that Defendant Feiten's Motion to Suppress Evidence [Dkt. # 26] is DENIED.


s/Robert H. Cleland\
ROBERT H. CLELAND\
UNITED STATES DISTRICT JUDGE

Dated:  March 9, 2016


I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, March 9, 2016, by electronic and/or ordinary mail.


s/Lisa G. Wagner\
Case Manager and Deputy Clerk\
(313) 234-5522